IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-00419-PAB-CBS

U2LOGIC, INCORPORATED,

     Plaintiff,

v.

AMERICAN AUTO SHIELD, LLC,

     Defendant.

_____

**ORDER**
_____

     This matter is before the Court on the Motion and Memorandum of Law in

Support of Motion for Summary Judgment [Docket No. 39] filed by defendant American

Auto Shield, LLC ("AAS").  This Court has subject matter jurisdiction over plaintiff

U2logic, Incorporated's ("U2logic") copyright claims pursuant to 28 U.S.C. §§ 1331 in

conjunction with 28 U.S.C. § 1338 and over U2logic's breach of contract claim pursuant

to 28 U.S.C. § 1367.

**I.  BACKGROUND**[1]

     U2logic is a software developer that develops and licenses database-oriented

software.  Docket No. 52 at 5, ¶ A.  U2logic is owned by Doug Averch.  Docket No. 42-1

at 2, ¶ 3.  AAS is an administrator of vehicle service contracts.[2]  Vehicle service

contracts are sold by third parties and provide customers repair coverage on vehicles

---

[1]The following facts are undisputed unless otherwise indicated.

[2]AAS was formerly known as Warranty America, LLC.  Docket No. 52 at 5, ¶ B.
The Court will refer to AAS and Warranty America, LLC collectively as "AAS."

outside of the vehicle's manufacturer warranty.  Docket No. 52 at 5, ¶ B.  Customers

who have purchased a vehicle service contract contact AAS to make repair claims and

AAS adjudicates each claim under the terms of that customer's vehicle service contract.

*Id.*

Around 2004, U2logic developed a software system for AAS which the parties

refer to as the Warranty and Claims software ("W & C" or the "W & C software").

Docket No. 39-2 at 12, p. 75:7-19; *see also* Docket No. 39 at 4, ¶ 11.  The W & C

software "handles various types of vehicle service contract and warranty programs" and

also "processes and adjudicates claims."  Docket No. 39-2 at 44.  U2Logic admits that

all rights to the W & C software are owned by AAS.  Docket No. 52 at 2; *see also*

Docket No. 39-2 at 13, p. 77:4-8.  AAS paid approximately $700,000 for the W & C

software, *Id.* at 13, p. 79:2-11, and has been using it since 2004.  Docket No. 39-4 at 6,

¶ 6.

On September 28, 2004, the parties executed the Software Licence Agreement

(the "license agreement").  Docket No. 39-2 at 33.  The license agreement granted AAS

a license to use U2logic's "Software," which, as relevant here, consisted of Customer

Relations Management ("CRM"), XLr8, and Redback software (collectively, the

"licensed software"), all of which was proprietary to U2logic.  *Id.* at 33, 37; Docket No.

52 at 5, ¶ C.  The license agreement provided AAS the right to use the licensed

software on any machine located in AAS's Arvada, Colorado facility and allowed AAS to

"make one (1) archival copy of the Software for each License copy obtained under this

License.  Licensee may not modify, decompile, disassemble, reverse engineer, copy,

create a derivative work, or otherwise use the Software except as stated in this License."  Docket No. 39-2 at 33, ¶¶ 2.A, 2.B.

The parties do not provide detailed descriptions of the licensed software and its respective functions.  CRM is a type of customer relations management software that tracks appointments and customer information.  Docket No. 52 at 5, ¶ D.  XLr8 software is a development platform used in the development of the W & C software.  Docket No. 39 at 3, ¶ 5.  Redback was "middleware" used to connect the W & C software to a vendor's customer database.  *Id.* at 3, ¶¶ 5, 7.  Although the license agreement does not reference U2WebLink ("WebLink") software, plaintiff claims that, because WebLink replaced Redback software, Docket No. 52 at 5, ¶ D, the license agreement is the operative license with regard to the WebLink software.  Docket No. 39 at 3, ¶ 7.  It is not entirely clear whether AAS disputes that the license agreement was operative with respect to the WebLink software.  AAS states that WebLink is not referenced in the license agreement.  Docket No. 43 at 10 n.10.  However, AAS argues that Section 2.B of the license agreement permitted it to keep an archival copy of the WebLink software on an outside server, which is an implicit concession that its WebLink software license is governed by the terms of the license agreement.  Docket No. 39 at 11.

On November 1, 2006, U2logic and AAS executed the Support Agreement (the "support agreement"), which provided that "U2 retains ownership of all tools, software developed and used under this Agreement, including improvements and enhancements to third-party software, except for the software described on Exhibit B."  Docket No. 39-2 at 40, ¶ 7.1; Docket No. 52 at 5, ¶ G.  The parties agree that Exhibit B to the support agreement describes the W & C software.  Docket No. 52 at 5, ¶ H.  Exhibit B states:

3

> The warranty software system handles various types of vehicle service contract and warranty programs. Also, the software processes and adjudicates claims. This software runs on IBM database called Unidata using the web middleware RedBack or U2logic's U2Weblink[TM] middleware. This software was written from the specifications supplied by Client and is continually modified to the Client's specifications.

Docket No. 39-2 at 44.

Tom Orlando worked as a programmer for U2logic and helped develop the W & C software. He also provided maintenance and support to AAS under the agreements between the parties. Docket No. 52 at 5, ¶¶ J-K. On February 28, 2008, Mr. Orlando resigned from U2logic and subsequently began working for AAS. *Id.* On June 19, 2008, Paul Stratch, AAS operations manager, emailed U2logic, asking whether there remained a need for maintenance on the CRM software. Docket No. 39-2 at 48-49. Mr. Averch replied that the W & C software was "built on top of the CRM code," which he testified was in an effort to tell AAS that the W & C software could not run without the CRM software. Docket No. 39 at 4-5, ¶ 16; Docket No. 39-2 at 13, pp. 77:4-78:11. In July 2008, AAS advised U2logic that it no longer had any need for CRM, Docket No. 52 at 5, ¶ L, and cancelled its license to use the CRM software. Docket No. 39 at 5, ¶ 17.

The parties dispute whether, after the CRM license was canceled in 2008, U2logic knew or had reason to know that AAS was continuing to use CRM software. Mr. Averch's deposition testimony on this point is inconsistent. When asked, he testified that he had reason to know as of 2008 that the CRM was likely being used as a part of the W & C software. Docket No. 39-2 at 3, p. 35:17-24. Later, he testified:

> Q. [H]ow did the Warranty America warranty and claims software continue to run without CRM?

A.  It didn't.  They still used it.

Q.  And you knew that in 2008?

A.  No.  I did not.

*Id.* at 13, pp. 77:23-78:3.  U2logic argues that this testimony is ambiguous and supports

Mr. Averch's declaration, which states that Mr. Averch believed that, after the CRM

license was canceled, AAS and Mr. Orlando modified the W & C software in a way that

no longer used CRM.  Docket No. 42 at 3-4, ¶ 18; Docket No. 42-1 at 2, ¶ 7.  AAS

further disputes that it continued to use protectable elements of the CRM software,

arguing the CRM software was "embedded" in the W & C software such that its use of

the CRM software in conjunction with the W & C software did not violate U2logic's CRM

software copyright.  Docket No. 39 at 14; *see also* Docket No. 39-4 at 16.  AAS also

argues that the field numbers[3] and equate file monikers[4] it adopted from the CRM

software are not protectable.  Docket No. 39 at 15; *see also* Docket No. 39-4 at 13.

On October 11, 2012, AAS advised U2logic that it would cease using the

_____

[3]A person's name and address can be electronically stored in parts or "fields."
Docket No. 42-3 at 7.  Software for storing information may have different fields and
may assign a different designation, or number, to each field.  *Id.*  For example, field 1
could represent a first name, field 2 a last name, and field 3 a mailing address, or field 1
could represent a full name and field 2 a zip code.  *See id.*  The contact information in
U2logic's software starts at field 116 with "Address Line 1, Address Line 2, City, State,
and Zip Code."  *Id.*

[4]Equate files, as relevant here, give names to the field numbers.  Docket No. 42-
3 at 9.  For example, field 116 may be given the name "EQUATE
CRM.CUSTOMERS.FIRST.NAME TO 116."  *Id.*  "That equates the name
CRM.CUSTOMERS.FIRST.NAME to the number 116.  Now in the code, the developer
can use CRM.CUSTOMERS.FIRST.NAME instead of 116, and know what that number
refers to."  *Id.*  All of U2logic's equate names end in ".AMC."  *Id.*

5

WebLink software.  Docket No. 52 at 6, ¶ M.  The parties do not dispute that AAS was authorized to use WebLink through January 2013, having paid U2logic for the right to do so.  *Id.* at 6, § N.  AAS claims that it ceased using the WebLink software prior to January 2013 in order to "get out of the web environment."  Docket No. 39 at 6, ¶ 26. However, the parties dispute whether sufficient evidence exists to conclude that AAS continued to use the WebLink software after January 31, 2013.  Matthew McAdams, U2logic's expert, conducted an on-site inspection of AAS's Arvada, Colorado facility and reviewed AAS's log files[5] for May through August 15, 2013.  Docket No. 42-3 at 10, 12.  In Mr. McAdams' opinion, AAS used U2logic products regularly between May and August 15, 2013 and had U2logic products installed on three different servers.  *Id.* at 12.  U2logic argues that, based upon Mr. McAdams' opinion, a jury could conclude that AAS continued to use the WebLink software and infer that AAS ceased licensing WebLink to avoid paying licensing fees.  Docket No. 42 at 5, ¶ 26.  U2logic further argues that a jury could find that AAS continued to use U2logic software through August 2013 and had insufficient time to build replacement software, leading to the conclusion that AAS's use of U2logic software continued beyond the license term.  Docket No. 42 at 6, ¶ 39.  AAS's expert, Michael Horwith, asserts that the log files do not show that AAS actually used U2logic's software.  Docket No. 39-4 at 13-14.  AAS claims that, as of early October 2013, WebLink and other legacy software were deleted from AAS servers.  Docket No. 39 at 8, ¶ 39.  AAS argues that it did not delete WebLink until

---

[5]According to Mr. McAdams, "Log files are files that an application leaves to show what the application was doing, and when; it is a running history of an application's actions."  Docket No. 42-3 at 10.

October 2013 in order to preserve data for possible litigation, but maintains that it did not use WebLink as middleware after January 31, 2013, having replaced it with another middleware product.  Docket No. 39 at 7, ¶¶ 34-35; *see also* Docket No. 39-4 at 13.

On February 18, 2013, U2logic filed this case against AAS and Mr. Orlando. Docket No 1.  On March 11, 2013, U2logic filed the First Amended Complaint.  Docket No. 10.  On November 15, 2013, U2logic dismissed all claims against Mr. Orlando. Docket No. 29.  U2logic now asserts three claims against AAS: infringement of the CRM software copyright, infringement of the WebLink software copyright, and breach of the license agreement.  Docket No. 52 at 1.[6]  AAS purports to seek summary judgment on all aspects of U2logic's claims.  Docket No. 39 at 15-16.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a

---

[6]In its response to AAS's summary judgment motion, U2logic indicated that it "no longer pursues its claim against AAS for tortious interference with contractual relations and for breach of the Agreement by terminating the XLR8 license outside the time for doing so."  Docket No. 42 at 8.

verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

However, "[w]hen, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998)) (internal quotation marks omitted). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman,* 252 F.3d at 1115 (citing *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir.1994)). "In applying this standard, we view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party." *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

## III.  ANALYSIS

### A.  Infringement of the CRM Software Copyright

#### 1.  Statute of Limitations

AAS argues that U2logic's copyright infringement claim regarding the CRM software is barred by the statute of limitations.  Docket No. 39 at 9.  U2logic's copyright claims arise under federal copyright laws.  *See* 17 U.S.C. § 101 *et seq.*  Section 507(b) of the Copyright Act provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."  17 U.S.C. § 507(b).  Although § 507(b) is silent regarding the accrual of a copyright claim, the Tenth Circuit has applied the general rule that the statute of limitations "begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action."  *Cooper v. NCS Pearson, Inc.*, 733 F.3d 1013, 1015 (10th Cir. 2013) (quotations omitted); *see also Home Design Services, Inc. v. B & B Custom Homes, LLC*, 509 F. Supp. 2d 968, 972 (D. Colo. 2007) ("a claim accrues when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action"); *Fisher v. United Feature Syndicate, Inc.*, 37 F. Supp. 2d 1213, 1216 (D. Colo. 1999) ("A cause of action for copyright infringement under section 507(b) of the Copyright Act accrues 'when one has knowledge of a violation or is chargeable with such knowledge.'" (quoting *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994))).  This case was filed on February 18, 2013.  The question becomes whether, prior to February 18, 2010, U2logic had knowledge that AAS violated its CRM copyrights or was chargeable with

9

such knowledge.[7]

AAS argues that U2logic had actual knowledge of alleged infringement, proved

by the following exchange during Mr. Averch's deposition:

> Q.  But if the CRM could not be split apart from the warranty and claims
> software, how could they effectively cancel [the CRM licensing agreement]?
>
> A.  Good question.
>
> Q.  So is it fair to say you had reason to know as of 2008 that the CRM was
> likely being used as part of the warranty and claims software?
>
> A.  Yes.
>
> Q.  . . . Did you say Paul responded to your e-mail or not?
>
> A.  No.  He did not.
>
> Q.  Okay.  He just canceled the software, correct?
>
> A.  Yes.
>
> Q.  What, if any, actions did you take after 2008 to confirm whether CRM
> was still operating as part of the warranty and claims software?
>
> A.  I visited once again with Tom in 2009.

Docket No. 39-2 at 3, pp. 35:17-36:9.  However, AAS does not go on to explain what

Mr. Averch's 2009 visit with Mr. Orlando revealed.  U2logic responds that, because

---

[7]U2logic correctly argues that, regardless of whether it can be charged with knowledge of AAS's infringement prior to February 18, 2010, U2logic is not barred from recovering damages for any infringements that occurred after February 18, 2010.  *See Diversey v. Schmidly*, 738 F.3d 1196, 1200 (10th Cir. 2013) ("[§ 507(b)] does not provide for a waiver of infringing acts within the limitation period if earlier infringements were discovered and not sued upon, nor does it provide for any reach back if an act of infringement occurs within the statutory period" (quotations omitted); *MDM Grp. Assoc., Inc. v. Resortquest Int'l, Inc.*, No. 06-cv-01518-PAB-KLM, 2009 WL 2924821, at *3 (D. Colo. Sep. 9, 2009) ("The majority view . . . supports counting the three-year limitations period backward from the date that the complaint was filed, thus making timely any claims that accrued within the three years preceding the filing date").

counsel's question did not specify whether Mr. Averch's knowledge was of AAS's activities before or after the CRM license terminated, the cited testimony is subject to more than one interpretation.  U2logic also argues that AAS's interpretation of that exchange is inconsistent with Mr. Averch's later testimony in response to a question by AAS's attorney, where, when asked more directly about his knowledge of AAS continuing to run CRM after canceling its license, he denied knowing in 2008 that AAS was engaging in infringing behavior.  *Id.* at 13, pp. 77:23-78:3.  The Court finds that a genuine factual dispute exists as to U2logic's actual knowledge and must resolve such dispute in U2logic's favor.

AAS's argument concerning constructive knowledge is based upon three undisputed facts, namely, that U2logic knew: (1) that the W & C software was built on top of the CRM software, (2) that the W & C software could not run without the CRM software, and (3) that AAS canceled its license for the CRM software.  Docket No. 39 at 9.  AAS argues that U2logic knew that AAS continued to use the W & C software and, as a result, should be charged with knowledge that AAS necessarily continued to use the CRM software.  *Id.*  AAS asserts that, after spending $700,000 on the W & C software, it is unreasonable to believe that AAS would so quickly abandon it and that the email exchange between Mr. Averch and Mr. Stratch did not reference an intent to discontinue using the W & C software.  However, the email exchange also contains no direct indication that AAS intended to continue using the W & C software.  *See* Docket No. 39-2 at 48-49.  AAS also points out that, during his deposition, Mr. Averch was asked how it was possible for AAS to cancel CRM and continue to use W & C software and responded "Good question."  Docket No. 39-2 at 3, p. 35:17-20.  However, as

11

discussed above, Mr. Averch's deposition testimony can also be interpreted as denying knowledge that AAS continued to use the W & C software. *Id.* at 13, pp. 77:24-78:3. To the extent AAS claims that its continued use of the U2logic software XLr8 and WebLink software conclusively establishes that it continued to use the W & C software, AAS fails to rebut Mr. Averch's statement that such software products "are compatible with programs other than CRM."  Docket No. 42-1 at 3, ¶ 8.  Considering the facts and inferences in the appropriate light, the Court concludes that a genuine dispute of material fact exists as to whether, before February 18, 2010, U2logic knew or should have known that AAS was using the CRM software in violation of U2logic's copyright.

## 2. *Breach of Contract Versus Copyright Infringement*

AAS argues that, because the CRM software was, at one time, a licensed product, U2logic's claim that AAS continued to use the CRM software after the CRM license terminated can only be brought as a breach of contract action, but not as a claim for copyright infringement.  Docket No. 39 at 12.[8]  In support of its argument, AAS *Evolution, Inc. v. Suntrust Bank*, 342 F. Supp. 2d 943, 953 (D. Kan. 2004), for the proposition that a copyright licensor's remedy against a licensee that violates a licensing agreement is generally for breach of contract rather than copyright infringement.  Docket No. 39 at 12.  AAS relies on an incomplete statement of the law. "[I]f the licensee exceeds the *scope* of the copyright license, then the copyright owner

---

[8]Although AAS primarily asserts this argument in opposition to U2logic's claim for infringement of the WebLink copyright, AAS's brief also asserts that the software license for CRM "supersedes any infringement claim."  Docket No. 39 at 15.  As such, the Court finds it appropriate to consider AAS's argument on this issue in the context of U2logic's claim for infringement of the CRM copyright.

may bring an action for copyright infringement." *Evolution*, 342 F. Supp. 2d at 953 (emphasis in original) (denying summary judgment on the issue of whether plaintiff's copyright infringement claims are properly breach of contract claims).[9]  However, acts that violate a term of the copyright license are resolved through a breach of contract action.  *Id.*  "Even if a license agreement previously existed, a copyright action can arise once a licensee makes himself a 'stranger' to the licensor by using the copyrighted material in a way that exceeds the duration or scope of the license." *E. Broad. Am. Corp. v. Universal Video, Inc.*, 2006 WL 767871, at *2 (E.D.N.Y. March 24, 2006); *see also Marshall v. New Kids On The Block P'ship*, 780 F. Supp. 1005, 1009 (S.D.N.Y. 1991).  Thus, once "an assignment or license has expired, 'the copyright proprietor may hold his former grantee liable as an infringer for subsequent use of the work.'" *Gerig v. Krause Publ'ns, Inc.*, 58 F. Supp. 2d 1261, 1267-68 (D. Kan. 1999) (quoting *Encyclopedia Brown Prods., Ltd. v. Home Box Office, Inc.*, 1998 WL 734355, at *7 (S.D.N.Y. Oct. 15, 1998)) (collecting cases).

Here, the license agreement granted AAS the "nonexclusive, non-transferable right to use" the CRM software, but also stated that "[u]pon termination of this License

---

[9]The following example is illustrative:

[C]onsider a license in which the copyright owner grants a person the right to make one and only one copy of a book with the caveat that the licensee may not read the last ten pages.  Obviously, a licensee who made a hundred copies of the book would be liable for copyright infringement because the copying would violate the Copyright Act's prohibition on reproduction and would exceed the scope of the license.  Alternatively, if the licensee made a single copy of the book, but read the last ten pages, the only cause of action would be for breach of contract, because reading a work does not violate any right protected by copyright law.

*Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1316 (Fed. Cir. 2005).

for any reason, Licensee's rights under this license will cease."  Docket No. 39-2 at 33-34.  There is no dispute that AAS's license to use the CRM software expired upon termination in July 2008.  Docket No. 39 at 5, ¶ 17.  As such, any  use of the CRM software after July 2008 exceeded the duration (or scope) of the license agreement with respect to the CRM software and is therefore the basis for a copyright infringement claim.  *See Tasini v. New York Times Co., Inc.*, 206 F.3d 161, 171 (2d Cir. 2000) ("an infringement claim may be brought to remedy unauthorized uses of copyrighted material").  AAS offers no meaningful argument to the contrary.  *See* Docket No. 43 at 7.  AAS's motion for summary judgment with respect to this issue is denied.

### 3.  *Creativity*

AAS asserts that it is not liable for copyright infringement because, to the extent that it continued to use elements of the CRM software, such elements were not "creative" and therefore were not protectable under copyright law.  Docket No. 39 at 15.  In order to sustain a claim for copyright infringement, plaintiff must show "(1) ownership of a valid copyright, and (2) copying by the defendant of the protected components of the copyrighted material."  *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 831 (10th Cir. 1993).  Here, AAS does not appear to dispute the first element.  As to the second element, U2logic must prove that AAS unlawfully appropriated protected portions of the copyrighted work, which consists of two inquiries: "1) whether the defendant, as a factual matter, copied portions of the plaintiff's program; and 2) whether, as a mixed issue of fact and law, those elements of the program that have been copied are protected expression and of such importance to the copied work that

the appropriation is actionable." *Id.* at 832.  AAS does not appear to dispute that its

continued use of the CRM software constituted copying.  *See Tasini*, 206 F.3d at 171.

Thus, AAS is entitled to summary judgment on U2logic's claim for infringement of the

CRM software only if it can show that the elements of the CRM software that it used are

not protected expression or that the protectable elements do not "comprise a

substantial part of the plaintiff's program when it is considered as a whole."  *See Gates*

*Rubber*, 9 F.3d at 834.

        In order to separate idea from expression, the Tenth Circuit employs the

abstraction-filtration-comparison test.  *Paycom Payroll, LLC v. Richison*, — F.3d —,

2014 WL 3377679, at *5 (10th Cir. July 11, 2014).  The "abstraction" component of the

test requires a conscientious and systematic documentation of the levels of abstraction,

which, in the case of computer programs, often breaks down into "'at least six levels of

generally declining abstraction: (I) the main purpose, (ii) the program structure or

architecture, (iii) modules, (iv) algorithms and data structures, (v) source code, and (vi)

object code.'"  *Paycom*, 2014 WL 3377679, at *6 (quoting *Gates Rubber*, 9 F.3d at 834-

35).  "Once a court has succeeded in identifying the various levels of abstraction, . . . it

must filter out those elements of the program that are not protected by copyright."

*Gates Rubber*, 9 F.3d at 836.  "After the court has filtered out those elements of the

original program that it has found to be unprotectable, it is left with a core of protected

elements that can be compared to the alleged infringing program."  *Id.* at 838-39.

Abstraction, the first step of the analysis "is important, and cannot be neglected" such

that "[a]bsent abstraction . . . filtration cannot proceed."  *Paycom*, 2014 WL 3377679, at

*6-*7.

AAS argues that "the field assignments and the moniker AMC in the equate files lack the modicum of creativity necessary for copyright protection."  Docket No. 39 at 15. AAS cites *Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366 (10th Cir. 1997), in support of its argument that the field assignments and the AMC moniker in the equate files are an "'arbitrary assignment of particular numbers to particular functions . . . lack[ing] the modicum of creativity necessary to transform mere selection into copyrightable expression.'"  Docket No. 39 at 15 (quoting *Mitel*, 124 F.3d at 1374 (alteration added)).[10] Although AAS identifies two elements of the CRM software it believes are not protected expression, AAS's argument is nonetheless an invitation to bypass the abstraction analysis and proceed directly to filtration.  The Court declines the invitation.  The Tenth Circuit has held that an abstraction analysis must be carefully undertaken and that failure to do so can result in reversible error.  *See Paycom*, 2014 WL 3377679, at *6-*7 (criticizing special master's report, which the district court adopted *in toto*, for failing to conduct abstraction analysis and instructing district court to request a more thorough report).

In cases where "the alleged infringement constitutes the admitted literal copying of a discrete, easily-conceptualized portion of a work, [the court] need not perform complete abstraction-filtration-comparison analysis [and] may proceed directly to the protectability analysis."  *Mitel*, 124 F.3d at 1373.  Here, however, AAS does not explain why the two elements it identifies are easily conceptualized and the expert reports

_____

[10]AAS quotes the opinion's recitation of the district court's conclusion, not the Tenth Circuit's holding.  *See Mitel*, 124 F.3d at 1373.

submitted by the parties provide no basis for so concluding.  Moreover, U2logic's

infringement claim does not appear to be limited to only the elements identified by AAS.

Rather, U2logic alleges that AAS "used, and continue[s] to use, portions of the CRM

software either as a illegal copy and/or illegal derivative work."  Docket No. 10 at 5, ¶

28; *cf. Mitel*, 124 F.3d at 1373.  Thus, the "expedited analysis sanctioned in *Mitel*" is

inapplicable to this case and the Court cannot proceed without a conscientious and

systematic documentation of the levels of abstraction.  *See Paycom*, 2014 WL

3377679, at *6-*7 (distinguishing *Mitel* because "David has not admitted literal copying

of a discrete, easily-conceptualized portion of a work.  Ernest Group's allegation of

copyright infringement is broad.").

     The remaining question is whether sufficient facts exist for the Court to conduct

an abstraction analysis.  Mr. Horwith's report mentions the term "data abstraction"

multiple times, *see, e.g.*, Docket No. 39-4 at 9, but he does not otherwise elucidate the

levels of abstraction as related to the CRM software or clearly articulate the necessary

facts upon which the Court could conscientiously document such levels.  *See Gates

Rubber*, 9 F.3d at 835 ("Ordinarily, expert testimony will be helpful to organize a

particular program into various levels of abstraction.").  AAS does not attempt to

interpret Mr. Horwith's report on this issue or explain how the Court should conduct an

abstraction analysis on the facts presented.  Mr. McAdams' report offers a far more

detailed description of the field assignments and the equate files, but does not

otherwise explain where such elements would fall in an abstraction analysis.  *See

Docket No. 42-3 at 6-10.  Although the abstraction analysis "is not an end in itself, . . . it

is a tool that facilitates the critical next step of filtering out unprotectable elements of the program." *Gates Rubber*, 9 F.3d at 836.  Because the Court lacks the necessary facts to conduct an abstraction analysis and cannot proceed directly to the filtration step, AAS has not shown that it is entitled to summary judgment on this issue.

### 4. Embedment

AAS argues that "since the CRM software was embedded in the Warranty and Claims software developed by the Plaintiff but owned by AAS, any claim based on infringement of the CRM software embedded in the Warranty and Claims software is not actionable."  Docket No. 39 at 14.  AAS cites 17 U.S.C. § 106(2) and *Micro Consulting , Inc. v. Zubeldia*, 813 F. Supp. 1514 (W.D. Okla. 1990), in support of its argument and further asserts that:

> any use of the CRM software that was embedded in the Warranty and Claims software, whether modified or not, is not an infringement or a breach of contract as AAS was only modifying software that the Plaintiff developed for AAS at a cost of $700,000.  Furthermore, even if the CRM software was not embedded, AAS had a right to modify the Warranty and Claims software to enhance its functionality and make it useable to AAS.

Docket No. 39 at 14.  U2logic's copyright claim is based upon AAS's continued and unlicensed use of CRM.  Docket No. 52 at 2.  U2logic concedes that its claim is not based upon AAS modifying the W & C software, such that "[h]ad AAS only changed its software not to rely on CRM, the analysis would be different."  Docket No. 42 at 12. Rather, U2logic argues that the W & C software relies on the CRM software such that each time AAS uses the W & C software it also uses the CRM software without a license, infringing on U2logic's CRM copyright.  Docket No. 42 at 12.

The question then becomes whether, by virtue of the fact that the W & C

software relies on CRM (or that the CRM software is embedded in the W & C software),
AAS is entitled, as a matter of law, to use CRM without a license in conjunction with the
W & C software.  The basis for AAS's argument is unclear.  First, AAS appears to
invoke § 106(2) as a defense to copyright infringement.  A copyright owner has the
exclusive right to "prepare derivative works based upon the copyrighted work."  17
U.S.C. § 106(2).[11]  Thus, U2logic, as the owner of the CRM copyright, has the exclusive
right to prepare a derivative work based upon CRM.  *See, e.g.*, *Vault Corp. v. Quaid
Software Ltd.*, 847 F.2d 255, 258-59 (5th Cir. 1988) ("It is not disputed that . . . Vault
has . . . the exclusive right to reproduce its program in copies and *to prepare derivative
works based upon its program* . . . ." (emphasis added)).  AAS presents no evidence
that U2logic granted AAS the right to prepare a derivative work based upon CRM.  *See
Liu v. Price Waterhouse LLP*, 302 F.3d 749, 754 (7th Cir. 2002) ("Price Waterhouse . . .
possesses the exclusive right to prepare derivative works from this original program
[and] in order for the Sky Company programmers to have lawfully prepared a derivative
work, the programmers needed authorization from Price Waterhouse to use its original
program.").

Second, AAS does not appear to raise a contract defense or otherwise argue
that AAS's purchase of the W & C software constituted an implied purchase of the right
to use the CRM software in conjunction with the W & C software.  The record does not
contain a purchase agreement for the W & C software and, although the support
agreement references the W & C software, the support agreement does not explain the

---

[11]"A derivative work is a work based upon one or more preexisting works."  17
U.S.C. § 101.

19

composition of the W & C software or otherwise provide a basis upon which to conclude that the purchased W & C software included the CRM software.  *See* Docket No. 39-1 at 2-3; Docket No. 39-2 at 39-44.  To the contrary, the parties executed a licensing agreement for AAS's right to use the CRM software, which further belies any claim by AAS that it had the contractual or equitable right to use the CRM software without a license.  *See* Docket No. 39-2 at 33, 37 (providing for licensing of CRM software to AAS).

AAS's reply brief does not clarify its argument.  AAS argues that U2logic "chose to embed the CRM software in the [W & C] software instead of creating an independent program that interacted with its CRM software."  Docket No. 43 at 5.  AAS relies upon Mr. Averch's email admitting that the W & C software "was built on top of the CRM code."  Docket No. 39-2 at 48.  AAS's expert, Michael Horwith, opines that the "integration of the CRM and the accounting software into the Warranty system is a perfect example of spaghetti code," which is a term of art in software programming used to describe "software in which the functionality is so intertwined that it is impossible to separate one procedure from another."  Docket No. 39-4 at 23.  Thus, in Mr. Horwith's opinion, the "argument that AAS is violating a license agreement by inadvertently accessing the CRM or the vendor file is absurd."  *Id.*  However, AAS provides no legal authority to support AAS's argument that intertwining the CRM code with the W & C software renders the CRM software unprotectable or is otherwise a valid defense to copyright infringement.  *Cf. Zubeldia*, 813 F. Supp. at 1526.  Moreover, a reasonable juror could reject AAS's characterization of Mr. Averch's email.  Given AAS's failure to support its embedment argument either factually or legally, AAS's

motion for summary judgment on this claim is denied.

### B.  Infringement of the WebLink Software Copyright

#### 1.  Breach of Contract Versus Copyright Infringement

AAS argues that, "[s]ince the WebLink software was a licenced product, the Plaintiff's cause of action is for breach of contract and not copyright infringement for violation of the license after January 31, 2013."  Docket No. 39 at 12.  AAS does not argue that it retained the contractual right to use the WebLink software after January 31, 2013.  Docket No. 52 at 6, ¶ N; Docket No. 43 at 7.  Thus, as discussed above, AAS's alleged use of the WebLink software after January 31, 2013 properly forms the basis of a copyright infringement claim.  The Court will deny AAS's motion for summary judgment on this issue.

#### 2.  AAS's Use of the WebLink Software after January 31, 2013

AAS claims that U2logic fails to produce evidence that AAS used the WebLink software after January 31, 2013.  Docket No. 39 at 12.  U2logic argues that Mr. McAdams' opinion concerning AAS's continued use of the WebLink software is sufficient to create a genuine dispute of material fact.  The Court agrees.  Mr. McAdams states that the log files show that WebLink was started each time the server was restarted – more than two dozen times – in May through August 15 of 2013.  Docket No. 42-3 at 10-11.  From these log files Mr. McAdams concluded that U2logic's application was installed and running during that time.  *Id.* at 10.  Mr. Horwith responds that a software service called U2WebLink was automatically started each time a server rebooted, but ceased when, in early October 2013, "AAS removed the legacy software

left behind by U2logic." Docket No. 39-4 at 13-14.  Mr. Horwith further claims that the
removal of the legacy software had no effect on the Administration System, the
application AAS used to replace the U2logic software, which he claims supports the
conclusion that the Administration System "made no use of the U2Weblink service."  *Id.*
at 14.  However, implicit in Mr. Horwith's conclusion is an admission that WebLink
software remained present on AAS's servers despite the fact that its WebLink license
was no longer in effect.  Although Mr. Horwith disputes Mr. McAdams' opinion and AAS
argues that its use of WebLink was not "substantive[]," the Court cannot resolve such a
dispute in AAS's favor.

   AAS further argues that it did not entirely remove the WebLink software from its
servers because, after receiving an October 16, 2012 letter from counsel for U2logic,
which first raised the possibility of litigation, and a March 22, 2013 letter, where U2logic
requested that plaintiff preserve relevant electronically stored information, Docket No.
39 at 13 (citing Docket No. 39-2 at 45, 53), it had a duty to preserve evidence.  In
support of this argument, Mr. Horwith claims that the WebLink software was maintained
on the servers pursuant to the litigation hold, but was not used after January 31, 2013.
Docket No. 39-4 at 6, 13.  However, Mr. McAdams states that the log files he reviewed
indicated that 52 distinct network addresses used XLr8 components "from the internal
network," and 58 different addresses used XLr8 components from home computers,
smart phones, or other addresses outside the internal network.  Docket No. 42-3 at 11.
On some days more than 30 computers used XLr8 components.  *Id.*  A reasonable juror
could infer that AAS's use of the XLr8 software exceeded that which was reasonably
necessary to comply with a litigation hold.  Because WebLink remained on AAS's

servers and was a product related to the W & C software, which AAS admits it continued to use, a reasonable juror could conclude that AAS's use of the WebLink software was consistent with its use of the XLr8 software.  Mr. McAdams also stated that "U2logic products were used regularly and by approximately 50 people from May through mid-August 2013," *Id.* at 12, from which a reasonable juror could infer the same conclusion.

Nonetheless, the Court agrees with AAS that U2logic has failed to produce any evidence upon which to conclude that use of WebLink continued after AAS removed the legacy software in October 2013.  Mr. McAdams does not refute Mr. Horwith's opinion that, as of October 2013, AAS removed all U2logic code from its servers.  As such, U2logic has failed to show that a genuine dispute exists as to AAS's use of WebLink software after U2logic code was removed from AAS servers in October 2013.  To the extent U2logic's WebLink software copyright infringement claim is based on AAS's use of the software prior to October 2013, U2logic's claim survives.  To the extent U2logic's claim is based upon AAS's use of the WebLink software after the U2logic code was removed,[12] AAS's motion for summary judgment on this claim is granted.

### C.  Breach of Contract

U2logic asserts that its breach of contract claim is based upon the following provisions of the license agreement: (1) that AAS violated paragraph 2.B by "taking steps to 'modify, decompile, reverse engineer, copy, create a derivative work, or

---

[12]The record does not appear to contain the exact date in October 2013 on which the U2logic software was entirely removed from AAS's servers.

otherwise use the Software except as stated in this License'" and (2) that AAS violated paragraph 2(A) by making copies and using U2logic's software at secondary locations other than AAS's Arvada office.  Docket No. 42 at 18 (quoting Docket No. 39-2 at 33). U2logic also asserts that AAS breached the agreement because "[a] substantially greater number of AAS users employed U2logic's software than was permitted by the license."  *Id.* at 18 n.2.

AAS argues that U2logic's breach of contract claim related to paragraph 2.B is barred by the statute of limitations.  In Colorado, the statute of limitations for breach of contract claims is three years.  Colo. Rev. Stat. § 13-80-101(1)(a).  A breach of contract claim accrues "on the date the breach is discovered or should have been discovered by the exercise of reasonable diligence."  § 13-80-108(6).  Although the license agreement for the CRM software terminated in 2008, for the above stated reasons related to post-July 2008 use of the CRM software, a genuine dispute of fact exists as to when U2logic knew or should have known that AAS modified or otherwise used the CRM software in a manner prohibited by the license agreement prior to the agreement's termination with respect to the CRM software.[13]  AAS's motion for summary judgment on this issue is denied.

The Court turns to U2logic's claim based upon paragraph 2.A.  Paragraph 2.A provides that a "separate license is required for use of the Software by Licensee at any

---

[13]It is not clear that U2logic asserts that AAS violated Section 2.B with respect to the WebLink and XLr8 software.  Docket No. 52 at 2.  In any event, AAS's motion does not raise the statute of limitations defense with respect to the WebLink and XLr8 software.  *See* Docket No. 39 at 10.  The Court will not determine whether such a claim, if asserted, would be barred by the statute of limitations.

other location" and paragraph 2.B provides that AAS "may also make one (1) archival copy of the Software for each License copy obtained under this License."  Docket No. 39-2 at 33.  AAS argues that U2logic's claim under paragraph 2.A fails because paragraph 2.B permitted it to make an archival copy of the licensed software.  Docket No. 39 at 11.  U2logic admits that AAS was permitted to store a copy of the software at a location outside AAS's Arvada office, but argues that, rather than storing a backup copy of the software, AAS "*installed* the software on two additional servers" in violation of the license.  Docket No. 42 at 18 (emphasis in original).  Mr. McAdams indicates that he found U2logic's products installed on three servers.  Docket No. 42-3 at 12.  AAS's three servers, according to Mr. Orlando, are the main server, the backup server, and the development server.[14]  Docket No. 42-4 at 6, p. 53:3-12.  Mr. Orlando's testimony, when viewed in the light most favorable to U2logic, further supports U2logic's claim for breach of paragraph 2.B.  Mr. Orlando testified that the software was installed on only the main and backup servers, *id.*, but later testified that he put files related to CRM on the development server, which was used for the purpose of developing new pieces of software or changing existing software.  Docket No. 39-3 at 14, pp. 78:10-80:18.  He admitted that, under the license agreement, he understood that such information was not permitted to be on the development server and placing the information on the development server was "sloppy."  *Id.*  AAS indicates that its backup server was located in Florida.  Docket No. 43 at 3, ¶ 8.  Therefore, a reasonable juror could conclude that AAS installed the licensed software in a location other than its Arvada, Colorado facility.

---

[14]Mr. Orlando testified that the development server is also referred to as the "test" server."  Docket No. 42-4 at 6, p. 53:3-12.

The issue then becomes whether AAS's installation of the licensed software on the Florida backup server was an "archival copy" as contemplated by paragraph 2.B of the agreement.[15]  AAS does not argue that the term "archival copy" is ambiguous so as to warrant the consideration of extrinsic evidence and, moreover, fails to provide sufficient facts explaining the circumstances under which the licensed software was installed and maintained on the Florida backup server.  Thus, the Court lacks a sufficient basis to conclude, as a matter of law, that the installation of such software on the Florida backup server did not violate the license agreement.  AAS's motion for summary judgment on this issue is denied.

The Court turns to U2logic's claim that AAS breached the agreement by exceeding the number of users permitted by the license agreement.  AAS argues that the First Amended Complaint contains no such allegation.  Docket No. 43 at 9.  The Court agrees.  The proposed Second Amended Complaint alleges that "a substantially greater number of users employed the software than was permitted by the license," Docket No. 32-1 at 9, ¶ 61, but U2logic's Motion for Leave to File Second Amended Complaint [Docket No. 32] was denied.  Docket No. 40 at 2.  The First Amended Complaint, the operative pleading, and the Final Pretrial Order contain no such allegation.  As such, U2logic has failed to plead a claim that the number of AAS users of the licensed software violated the terms of the license agreement and will not be

---

[15]AAS incorrectly believes that U2logic has conceded this issue.  *See* Docket No. 43 at 8-9.

26

permitted to assert such a claim at trial.[16]

## IV.  CONCLUSION

For the foregoing reasons, defendant's Motion and Memorandum of Law in Support of Motion for Summary Judgment [Docket No. 39] is **GRANTED** in part and **DENIED** in part as indicated in this Order.

DATED September 30, 2014.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

---

[16]In any event, U2logic fails to identify the provision of the license agreement containing such a limitation.